**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MEGAN TAYLOR, as an individual, on behalf of herself, the general public and those similarly situated, | |
| Plaintiff, | 23-cv-16439 |
| v. | **CLASS ACTION COMPLAINT** |
| DAVE'S KILLER BREAD, INC., FLOWERS FOODS, INC. and FLOWERS BAKERIES, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

## <u>INTRODUCTION</u>

1.      Plaintiff Megan Taylor, by and through her counsel, brings this class action against Defendants Dave's Killer Bread, Inc., Flowers Foods, Inc., and Flowers Bakeries, LLC (collectively, "Defendants") to seek redress for their unlawful and deceptive practices in labeling and marketing their consumer food products sold under the brand name Dave's Killer Bread.

2.      Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein. To capitalize on this trend, Defendants prominently label many of their consumer food products with claims that the products provide a specific amount of protein per serving, such as "5g PROTEIN" on the front labels of Dave's Killer Bread 21 Whole Grains and Seeds and Dave's Killer Bread Good Seed. Consumers, in turn, reasonably expect that each product will actually provide the amount of protein per serving claimed on the front of the product package in a form the body can use.

3.      The Food and Drug Administration ("FDA") prohibits such front label claims about the amount of protein, unless manufacturers also provide additional information in the

nutrition fact panel about how much of the recommended daily value for protein that the product will actually provide. 21 C.F.R. §§ 101.9(c)(7)(i), 101.13(b), (n). That is because the FDA recognizes that (1) when manufacturers tout an amount of protein on the front label, that amount is likely to be material to purchasing decisions, even though reasonable consumers may not know the total amount of protein they need to ingest on a daily basis, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams does not actually inform consumers about how much usable protein they are receiving. Some proteins are deficient in one or more of the nine amino acids essential to human protein synthesis and/or are not fully digestible within the human gut. When a human body uses up the least prevalent essential amino acid from a food product, protein synthesis shuts down and all of the remaining amino acids from that protein source degrade mostly into waste. Likewise, whatever portion of a protein source is not digestible is similarly unavailable for protein synthesis. A protein's ability to support human nutritional requirements is known as its "quality."

4.      The FDA required method for measuring protein quality is called the "Protein Digestibility Corrected Amino Acid Score"—known by its acronym PDCAAS (pronounced Pee-Dee-Kass). It combines a protein source's amino acid profile and its percent digestibility into a discount factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support human nutritional requirements. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii). For example, a PDCAAS of .5 means that only half of the protein in that product is actually available to support human protein needs. If the product contained 10 grams total protein per serving, the corrected amount of protein would be only 5 grams per serving. As a result, protein products can vary widely in their ability to support human protein needs—even between two comparator products with the same total protein quantity.

5.      Because consumers are generally unaware about the usability of various proteins,

Class Action Complaint

and may even be unaware of the total amount of usable protein they should ingest each day, the FDA prohibits manufacturers from advertising or promoting their products with a protein claim unless they have satisfied two requirements. First, the manufacturer must calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method. Second, the manufacturer must use the PDCAAS computation to provide "a statement of the corrected amount of protein per serving" in the nutrition facts panel ("NFP") "expressed as" a percent daily value ("%DV") and placed immediately adjacent to the statement of protein quantity. 21 C.F.R. § 101.9(c)(7)(i)-(iii). The %DV is the corrected amount of protein per serving divided by the daily reference value for protein of 50 grams. *Id.* Using the same example of a product containing 10 grams total protein per serving with a PDCAAS of .5, the %DV is 10% (5g/50g). Had all of the protein in the product been useful in human nutrition, the %DV would be 20% (10g/50g). The FDA regulations that govern nutrient content claims are also clear that the manufacturer may not make any front label claims about the amount of protein in the product unless it complies with these two requirements. *See* 21 C.F.R. § 101.13(b) ("A nutrient content claim[] may not be made on the label…unless the claim is made in accordance with this regulation [i.e., § 101.13]…" and (n) ("[n]utrition labeling in accordance with § 101.8…shall be provided for any food for which a nutrient content claim is made"); *accord* 58 Fed. Reg. 2302, 23310 (manufacturer can only make a "nutrient content claim…on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9.").

6.     The primary protein sources in Defendants' products are wheat and oats. Both wheat and oats are low-quality proteins with PDCAAS scores typically ranging between 0.4 and 0.5, which means Defendants' products will provide nutritionally as little as *50%* of the protein quantity claimed. Nevertheless, Defendants failed to provide in the NFP a statement of the corrected amount of protein per serving calculated according to the PDCAAS methodology and

Class Action Complaint

expressed as a %DV. Accordingly, the protein claims on the front of the package, such as "5G PROTEIN PER SERVING" are unlawful and deceptive in violation of federal regulations because Defendants did not comply with the regulatory requirements for making a protein claim. 21 C.F.R. § 101.9(c)(7)(i), 101.13(b), (n). Defendants' prominent protein claim on the front of the package, in the absence of any statement of the corrected amount of protein per serving expressed as a %DV in the NFP, is likely to mislead reasonable consumers. Consumers reasonably expect that Defendants' products will actually provide nutritionally the full amount of protein per serving claimed on the front of the package and stated in the protein quantity section of the NFP, i.e., that the products contain high quality proteins. But Defendants' products do not do so and instead consist of low quality protein. Had Defendants included a statement of the corrected amount of protein per serving in the NFP, as they were required to do under the law, it would have revealed that the product provides nutritionally as little as 50% of their total protein quantity and contains low quality proteins. That information was material to reasonable consumers.

7.     Defendants' unlawful and misleading protein claims caused Plaintiff and members of the class to pay a price premium for the products.

## **PARTIES**

8.     Plaintiff Megan Taylor is, and at all times alleged in this Class Action Complaint was, an individual and resident of Grayslake, Illinois. Her permanent home is in Grayslake, and she intends to remain in Grayslake. Ms. Taylor is, therefore, domiciled in Illinois.

9.     Defendant Dave's Killer Bread, Inc. ("DKB") is a corporation existing under the laws of Oregon with its principal place of business in Milwaukie, Oregon. DKB (formerly named AVB, Inc. until 2016) has been manufacturing, marketing, and selling the Dave's Killer Bread products since 2005.

Class Action Complaint

10.     Defendant Flowers Foods, Inc. ("Flowers Foods") is a corporation existing under the laws of Georgia with its principal place of business in Thomasville, Georgia. Flowers Foods acquired DKB in 2015 and identifies itself as the producer of the Dave's Killer Bread products.

11.     Defendant Flowers Bakeries, LLC ("Flowers Bakeries") is a limited liability corporation existing under the laws of Georgia with its principal place of business in Thomasville, Georgia. Flowers Bakeries is a subsidiary of Flowers Foods that distributes Dave's Killer Bread products.

12.     With respect to the allegations herein, DKB, Flowers Foods, and Flowers Bakeries were and are alter egos.

13.     With respect to the allegations herein, DKB, Flowers Foods, and Flowers Bakeries were each other agents and, in doing the things herein alleged, were acting within the scope and course of their authority as such agents.

14.     With respect to the allegations herein, each of the Defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

15.     With respect to the allegations herein, the acts and omissions of each of the Defendants concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

16.     With respect to the allegations herein, each of the Defendants ratified each and every act or omission complained of herein. At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and Plaintiff and Defendants are citizens of different states.

18.     The injuries, damages, and/or harm upon which this action is based occurred or arose out of the activities engaged in by Defendants within, affecting, and emanating from, the State of Illinois. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of Illinois. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of Illinois.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of Illinois, including within this District.

20.     Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

**SUBSTANTIVE ALLEGATIONS**

21.     Defendants manufacture, distribute, market, advertise, and sell a variety of bread products under the brand name "Dave's Killer Bread." Most of these products have packaging that predominately, uniformly, and consistently states on the principal display panel of the product labels that the products contain and provide a specific amount of protein per serving. Plaintiff has attached, as Exhibit A, is a non-exhaustive list of the Dave's Killer Bread products that make protein claims on the front of the product packages but failed to include the statement of the corrected amount of protein expressed as the percent of daily value in the Nutrition Facts Panel. The products listed in Exhibit A, and any other Dave's Killer Bread brand product that claims a specific amount of protein on the front of its label but failed to include the statement of the corrected amount of protein expressed as the percent of daily value in the Nutrition Facts Panel, will hereinafter be referred to as the "Products."

22.     The representations that the Products contain and provide a specific amount of

Class Action Complaint

protein per serving were uniformly communicated to Plaintiff and every other person who purchased any of the Products in Illinois. The same or substantially similar product label has appeared on each Product during the entirety of the Class Period in the general form of the following example:

Class Action Complaint



23.     The nutrition facts panel on the back of the Products uniformly and consistently failed to provide any statement of the corrected amount of protein per serving, expressed as a %DV, throughout the Class Period. The nutrition facts panels of the Products have appeared consistently throughout the Class Period in the general form of the following example:



24.     As described in detail below, Defendants' front label protein claims, which advertise the Products as containing and providing specific amounts of protein per serving, are unlawful and deceptive in that Defendants did not: (1) calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method; and (2) provide a statement of that corrected amount of protein per serving in the NFP, expressed as a %DV. 21 C.F.R. § 101.9(c)(7)(i) and (ii). Defendants' failure to comply with § 101.9 also makes

Class Action Complaint

the front label claims unlawful under §§ 101.13(n) and (b). The unlawful front label protein claims induced consumers to purchase the Products at a premium price. Had Defendants complied with FDA regulations and not included a protein claim on the front label of the Products, reasonable consumers would not have purchased them or would have paid less for the Products.

25.     Defendants' prominent front label protein claims made in the absence of any statement of the corrected amount of protein in the NFP deceived and mislead reasonable consumers into believing that a serving of the Products will provide the grams of protein represented on the label, when that is not true. Had Defendants complied with the law, the statement of the corrected amount of protein would have revealed to consumers that the Products provide significantly less protein than claimed because Defendants use low quality proteins in the Products, such as wheat and oats. The absence of this information also allowed Defendants to charge a price premium. Had reasonable consumers been informed of the true amount of protein that the Products provided through a statement of the corrected amount of protein per serving, as required by FDA regulations, they would not have purchased, or would have paid less for, the Products.

**Consumer Demand for Protein**

26.     Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of

Class Action Complaint

protein.[1]

27.     Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases. The National Academy of Medicine recommends that adults get a minimum of 0.8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[2] For a 140-pound person, that means about 50 grams of protein each day. For a 200-pound person, that means about 70 grams of protein each day.

28.     Protein *quantity* by itself does not tell the full story of protein from a human nutritional standpoint. A protein's *quality* is also critical because humans cannot fully digest or utilize some proteins. Proteins are not monolithic. They are simply chains of amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of the protein changes the function of that protein in the body, and certain types of proteins are more easily digested and used by humans than others.

29.     All of a human's proteins are formed through the process of protein synthesis within their own bodies. That is, although humans consume dietary proteins, they digest those proteins, break them down into their constituent amino acids, and then use those amino acids as building blocks to synthesize the human proteins necessary for life, tissue repair, and other functions. Of the twenty total amino acids, humans can produce only eleven of them on their own. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. These nine amino acids are called the "essential amino acids" and they must be

---

[1] FDA Protein Fact Sheet,
https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf
[2] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients).*

Class Action Complaint

supplied through the diet.

30.     All nine essential amino acids are necessary for protein synthesis to take place. Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value. As the FDA has explicitly recognized, "[b]ecause excess amino acids are not stored in the body, humans need a constant supply of good quality dietary proteins to support growth and development." 58 Fed. Reg. 2079 at 2101. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all of the essential amino acids in the correct proportions is typically called a "complete protein."

31.     A protein source's digestibility also affects the amount of useable protein a person receives from consuming it.  Plant-based proteins like wheat and oats are approximately 85% digestible, meaning 15% of the protein from those sources will simply pass through the body without ever being absorbed at all. PDCAAS is a combination of digestibility and the least prevalent amino acid, and when those factors combine, it means only about 50% of the wheat and oat protein is absorbed by the human body, i.e., the PDCAAS is about 0.5 for wheat.

32.     As the FDA has stated in official guidance, "[a]ccurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS") is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii).

33.     The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then combine that with the proteins' digestibility

Class Action Complaint

into an overall discount factor (i.e., a "score" from 0.0-1.0) that represents the actual amount of protein the food provides nutritionally when multiplied by raw protein quantity. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(i).

34.     Defendants use plant-based protein in their Products such as wheat and oats. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Although some plants can be high quality protein sources, most plant based proteins typically do not contain all nine essential amino acids and are low quality to humans. Wheat and Oats both have PDCAAS scores of around 0.4 and 0.5, meaning that approximately 50% of the protein from those sources will be useless to humans nutritionally speaking. Indeed, none of the protein sources in the Products consisted of high quality proteins; all of the protein in Products consists of low quality protein.

35.     Accordingly, Defendants' use of low-quality proteins means that they actually provide far less protein to humans than the Product labels claim.

**Federal Regulations Governing Food Labeling**

36.     Federal laws regulate the content of labels on packaged food. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, are applicable nationwide to all sales of packaged food products. Additionally, none of the state laws sought to be enforced here imposes different requirements on the labeling of packaged food for sale in the United States.

37.     The FDCA, 21 U.S.C. § 343(a), provides that a food is misbranded if "its labeling is false or misleading in any particular."

38.     According to FDA regulations, "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . ***shall*** be

given if a protein claim is made for the product . . . ." 21 C.F.R. § 101.9(c)(7)(i) (emphasis added). If a manufacturer does not want to perform PDCAAS and provide a statement of the corrected amount of protein per serving in the NFP, then it shall not make any protein claims.

39.     Section 101.13, which governs nutrient content claims, also makes this plain. Section 101.13(n) provides that "[n]utrition labeling in accordance with § 101.9 . . . shall be provided for any food for which a nutrient content claim is made" and § 101.13(b) states "a nutrient content claim[] may not be made on the label . . . unless the claim is made in accordance with this regulation [i.e., § 101.13] . . . ." In other words, a manufacturer may not make any protein nutrient content claims on the front labels of their products unless they have complied with the requirements for protein labeling in the nutrition facts panel pursuant to § 101.9(c)(7). Indeed, the FDA made clear when promulgating § 101.13(n) that a manufacturer can only make "a nutrient content claim . . . on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9." 58 Fed. Reg. 2302, 23310.

40.     Further, FDA regulations require the %DV for protein to be calculated using PDCAAS, a method that accounts for both protein quantity and protein quality. 21 C.F.R. § 101.9(c)(7)(ii); FDA Food Labeling Guide, p. 29, Question N.22.[3] The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by the PDCAAS quality value, and then dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to come up with the %DV. *Id.*

41.     The Products all make protein claims on the front label, but fail, uniformly, to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method. The protein claims on the front are unlawful, and were never

---

[3] Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download (last accessed February 18, 2020).

permitted to be on the label in the first instance under §§ 101.9(c)(7)(i), 101.13(n), and 101.13(b).

42.     Defendants' use of a front-label protein claim on each of the Products, while failing to include the required statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV, is misleading. Reasonable consumers are unaware of the nutritional value of various protein sources and upon seeing a front-label quantitative protein claim reasonably believe that all of the advertised protein will be nutritionally available—i.e., that the product contains high quality proteins. Had Defendant complied with the law, the statement of the corrected amount of protein expressed as a %DV would have revealed that the Products provide significantly less of the daily value of protein than high quality protein products with comparable protein quantities. Defendant's use of a front-label protein claim, while failing to include the required statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV, also enabled Defendant to conceal the fact that the Products consist of low quality proteins, that simply do not provide all of the protein that quantity alone represents. Indeed, when promulgating 21 C.F.R. § 101.9(c)(7), the FDA explained in published guidance that "Information on protein quantity alone can be misleading on foods that are of low protein quality." It also explained that it was prohibiting manufacturers from making any protein claims at all *unless* the manufacturer provides a statement of the corrected amount of protein per serving in the NFP based on PDCAAS because "nutrition labeling must allow consumers to readily identify foods with particularly low quality protein to prevent them from being misled by information on only the amount of protein present." 58 Fed. Reg. 2079 at 2101-2.

43.     Similarly, 21 C.F.R. § 101.13(i)(3) prohibits manufacturers from making a claim on the front of a product's package about the "amount or percentage of a nutrient," such as protein, if the statement is "false or misleading in any respect." If it is, then "it may not be made

on the label." 21 C.F.R. § 101.13(b). This is true even if the same amount appears in the nutrition facts panel. 21 C.F.R. § 101.13(c). Since the omission of the %DV from the nutrition facts panel rendered the front label protein claim misleading, the protein claim was not permitted to be on the front label.

44.    Under the FDCA, the term false has its usual meaning of "untruthful," while the term misleading is a term of art that covers labels that are technically true, but are likely to deceive consumers.

45.    The FDA explained in promulgating section 101.13(i) that the regulation was necessary "since many consumers have a limited knowledge and understanding of the amounts of nutrients that are recommended for daily consumption," which means that "a statement declaring that the product contained a specified amount of a nutrient could be misleading. By its very presence, such a statement could give consumers who were unfamiliar with the dietary recommendations the false impression that the product would assist them in maintaining healthy dietary practices relative to the amount of the nutrient consumed when it, in fact, would not." 56 Fed. Reg. 60421. The rules are different for amounts in the NFP and nutrient content claims because a voluntary nutrient declaration on the front panel "is viewed by the agency as an effort to market the food as a significant source of nutrients." 56 Fed. Reg. 60366.

46.    In addition to regulating the NFP, the FDA has promulgated a separate set of regulations that govern nutrient content claims on the front of a package. 21 C.F.R. § 101.13. A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement outside the Nutrition Facts Panel, about the level of a nutrient. 21 C.F.R. 101.13(b)(1); 21 C.F.R. § 101.13(c). Stating information from the nutrition facts panel (such as grams protein per serving) elsewhere on the package necessarily constitutes a nutrient content claim. 21 C.F.R. § 101.13(c). A manufacturer cannot make a nutrient content claim in the form of a "statement about the

amount or percentage of a nutrient" if the statement is "false or misleading in any respect." 21 C.F.R. 101.13(i)(3).

**Defendants' Marketing and Labeling of the Products Violates Federal Food Labeling Laws**

47.     Defendants' Products are unlawful, misbranded, and violate State and Federal law. Defendants make protein nutrient content claims on the front packaging of the Products even though the Products uniformly fail to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method and expressed as a %DV as required by 21 C.F.R. § 101.9(c)(7)(i). Defendants' failure to comply with this requirement renders the front label protein claims on each Product unlawful per se and the Products misbranded pursuant to § 101.13(n) and (b), as well as under § 101.9(c)(7)(i).

48.     Defendants' standalone, front label protein quantity claims are also misleading, and therefore prohibited by sections 101.13(i)(3), (b), and (n) due to Defendants' failure to include a statement of the corrected amount of protein per serving in the NFP for each Product calculated using the PDCAAS method and expressed as a %DV. Consumers have a "limited knowledge and understanding of the amount of [protein] that [is] recommended for daily consumption," let alone an understanding of the science behind protein quality and how different types of proteins are used and absorbed in the body. 56 Fed. Reg. 60421. The FDA requires a statement of the corrected amount of protein per serving in the NFP precisely to ensure that "consumers are not misled by information on only the amount of protein present" in a product with low quality protein. 58 Fed. Reg. 2079 at 2101–02. Defendants' failure to provide it for the Products rendered those labels misleading.

49.     Defendants' marketing, advertising, and sale of the Products violates the false advertising provisions of the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, et seq., which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception,

fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

50.     Under 815 ILCS 510/2, a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . . ; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of an-other; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

51.     Defendants engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 510/2 when they made misleading front label protein claims in the absence of the statement of the corrected amount of protein, which has caused damage and injury to Plaintiff and the Class members.  Plaintiff and Class members were injured by Defendants' unfair and deceptive conduct at the time of purchasing the Products.

52.     Likewise, Defendants' conduct violates the Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq., which prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the '[UDTPA]'"

53.     Defendants have violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.13(i)(3), (b), (c) and (n); and 21 C.F.R. § 101.9 (c)(7), which was implemented to prevent the false and misleading conduct described herein, by making front label protein claims in the absence of  nutritional information required

by law.

54.     A reasonable consumer would expect that the Products provide what Defendant identifies them to provide on the product labels and that the labels would not be contrary to the policies or regulations of the FDA and advertised in violation of Illinois law. For example, a reasonable consumer would expect that when Defendants label their Products with "5g PROTEIN" per serving, as it claimed on the Dave's Killer Bread 21 Whole Grains and Seeds bread and Good Seed bread product labels, the Products would provide 5 grams of protein per serving in a form their bodies could use as protein. Because Defendants did provide a statement of the corrected amount of protein per serving, expressed as a %DV, consumers have no idea that the Products nutritionally provide significantly less protein.

55.     Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendants' food labeling claims, especially at the point of sale. Reasonable consumers, when they look at the front label of the Products, believe that the Products provide the amount of protein represented on the front label. Because Defendants do not include legally required information as to the quality of the protein in the Nutrition Facts Panel via the statement of corrected amount of protein expressed as a %DV, consumers do not have any reason to think otherwise. Reasonable consumers do not walk around with the PDCAAS values for various protein sources in their heads. They would not know the true amount of protein the Products provide nutritionally merely by looking elsewhere on the product package. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that a serving of a Product does not provide the number of grams of protein that is represented on the label. An average consumer also lacks the specialized knowledge necessary to determine the PDCAAS for the Products. The average reasonable consumer had no reason to suspect that Defendants' representations on the packages were

Class Action Complaint

misleading. Therefore, consumers had no reason to investigate whether the Products actually do provide the amount of protein per serving that the labels claim they do and reasonably relied on Defendants' representations regarding the nature of the Products.

56.     Defendants intend and know that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendants have done with the claims on the Products that they contain and provide specific amounts of protein per serving.

**Defendants Misleadingly Market the Products to Increase Profits and Gain a Competitive Edge**

57.     In making false, misleading, and deceptive representations, Defendants distinguish the Products from their competitors' products. Defendants knew and intended that consumers would purchase, and pay a premium for, the Products. By using this branding and marketing strategy, Defendants are stating that the Products are superior to, better than, and more nutritious and healthful than other products that do not make protein claims, or that properly provide the required statement of the corrected amount of protein in the product as determined by the PDCAAS method and express as a %DV and otherwise do not mislead consumers about the amount of protein their products actually provide.

**Defendants Intend to Continue to Market Products as Containing More Protein than the Products Actually Contain**

58.     Because consumers pay a price premium for products that make protein claims, and also pay a premium for products that provide more protein, by labeling the Products as containing more grams of protein per serving than they actually provide, Defendants are able to both increase their sales and retain more profits.

59.     Defendants engaged in the practices complained of herein to further their private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do

not mislead consumers about the quality of the protein in their products, and/or (ii) commanding a higher price for the Products because consumers will pay more for the Products due to consumers' demand for products with protein claims.

60.     The market for protein products is continuing to grow and expand. Because Defendants knows consumers rely on representations about the number of grams of protein in food products, Defendants have an incentive to continue to make such unlawful and misleading representations. In addition, other trends suggest that Defendants have no incentive to change their labeling practices.

61.     For example, one market analysis revealed that between 2013–2017, product launches with a protein claim grew 31%.[4]

62.     To capitalize on the growing market, Defendants continue to launch new product lines and flavors to diversify their portfolio to maintain their competitive edge. Moreover, Defendants have continued to replicate their misrepresentations on new products. It is, therefore, likely that Defendants will continue to misleadingly advertise the Products and perpetuate the misrepresentations regarding the protein in the Products.

## PLAINTIFF'S EXPERIENCES

63.     Plaintiff purchased Dave's Killer Bread Good Seed Organic Bread multiple times her local grocery store in the State of Illinois during the Class Period.

64.     Plaintiff made each of her purchases after reading and relying on the truthfulness of Defendants' front labels that promised that the Products provided a specific amount of protein per serving. She believed the truth of each representation, i.e., that the product would actually provide the specific amount of protein claimed on the front labels in a form human bodies could

---

[4] https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch?utm_source=copyright&utm_medium=OnSite&utm_campaign=copyright

Class Action Complaint

utilize. She relied on the Products to meet her daily dietary protein needs. Had Defendants complied with the law and not made the protein claims on the front of their packages, she would not have been drawn to the Products and would not have purchased them. At a minimum, Plaintiff would have paid less for each Product..

65.     Moreover, had Defendants followed FDA regulations and adequately disclosed the corrected amount of protein per serving for each Product expressed as a %DV, Plaintiff would not have purchased the Product or would have, at minimum, paid less for it. Plaintiff checks the NFP before purchasing products for the first time, and she uses that information as a basis of comparison between similar products. She looked at and read the NFP on the Good Seed Organic Bread before purchasing it for the first time. Manufacturers do not always disclose a %DV for protein, but when they do, she selects the product that provides more of the recommend daily amount of protein (i.e., the one with a higher %DV). When a manufacturer does not provide a %DV for protein, she can only go off of the stated grams of protein, and she assumes that all of those disclosed grams are in a form her body can use as protein.

66.     For example, with the Good Seed Organic Bread, Plaintiff was looking for a product that would provide 5 grams of useable protein per serving. Had she seen that the product provided only approximately 5% (or less) of the daily value for protein, i.e., only approximately 2.5 grams or less corrected amount of protein per serving, she would not have purchased the Product or, at a minimum, she would have paid less for it. Plaintiff would also have used the information as a basis to compare similar products and would have chosen instead to purchase one with a higher %DV. Without the statement of the corrected amount of protein per serving in the form of a %DV, the only information Plaintiff had about the Good Seed Organic Bread cereal was the 5 gram protein quantity, and she believed she was receiving the full amount of that quantity in a form human bodies could use. Because the Products did not provide any statement of the corrected amount of protein per serving, Plaintiff did not have any reason to believe that

Class Action Complaint

the Products provided less protein than the amount represented on the front of the label. Plaintiff did in fact believe she was receiving 5 grams of high-quality protein when she purchased the Good Seed Organic Bread.

67.     Plaintiff continues to desire to purchase products that contain protein, including those marketed and sold by Defendants. Plaintiff would like to purchase products that provide, for example, 5 grams of useable protein per serving. If the Products were reformulated to provide, in a usable form, the grams of protein that are represented on the labels, or the labels were reformulated to provide non-misleading information, Plaintiff would likely purchase them again in the future. Plaintiff regularly visits stores where the Products and other bread products are sold. Because Plaintiff does not know the formula for Defendants' products, which can change over time, and cannot test whether the Products provide the amount of digestible protein that is represented on the label without first purchasing the Product, Plaintiff will be unable to rely on Defendants' labels when shopping for protein products in the future absent an injunction that prohibits Defendants from mislabeling the Products. Plaintiff would also be forced to retest and/or reanalyze each Product at each time of purchase because a Product's ingredient list and labeling would not reveal any changes in the amount of digestible protein, even if such changes took place. In addition, at present Plaintiff cannot rely on the accuracy of Defendants' labels for the entire line of Products, which Plaintiff is also interested in purchasing with labeling that comports with regulations. Should Defendant begin to market and sell a new line of products, Plaintiff could also be at risk for buying another one of Defendants' products in reliance on the same or similar misrepresentation and omissions. And because of Defendants' misleading labels on its Products, Plaintiff cannot make informed choices between protein products offered by Defendants and protein products offered by other manufacturers, such as choices based on price and relative nutritional content.

68.     Plaintiff and members of the Class have been economically damaged by their

Class Action Complaint

purchase of the Products because the advertising for the Products was, and remains, untrue and/or misleading under state law and the products are misbranded; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

## CLASS ALLEGATIONS

69.     Plaintiff brings this class action lawsuit on behalf of herself and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following group of similarly situated persons, defined as follows:

> The Class: All persons in any state, other than California, who purchased a Product(s) between December 1, 2018, and the present.
> The Subclass: All Class Members who purchased a Product(s) in the state of Illinois.

70.     This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

71.     Numerosity: Plaintiff does not know the exact size the Class but estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of its claims in a class action rather than in individual actions will benefit the parties and the courts.

72.     Common Questions Predominate: This action involves common questions of law and fact to the potential Class because each class member's claim derives from the deceptive, unlawful, and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact

common to the Class are:

  a. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are misleading;

  b. Whether Defendants' actions violate Illinois laws invoked herein;

  c. Whether labeling the Products with a protein claim causes the Products to command a price premium in the market;

  d. Whether Defendants' failure to provide a statement of the corrected amount of protein per serving in the Products, despite prominent front label protein claims, was likely to deceive reasonable consumers;

  e. Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

  f. The profits and revenues Defendant earned as a result of the conduct;

  g. Whether Class members are entitled to restitution, injunctive, and other equitable relief and, if so, what is the nature (and amount) of such relief; and

  h. Whether Class members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

73. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendants in violation of law as complained of herein. Further, the damages of each member of the Class were caused directly by Defendants' wrongful conduct in violation of the law as alleged herein.

74. **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of all Class members because it is in Plaintiff's best interests to prosecute the claims alleged herein to obtain full compensation due to Plaintiff for the unfair and illegal conduct of

which Plaintiff complains. Plaintiff also has no interests that conflict with, or are antagonistic to, the interests of the Class. Plaintiff has retained highly competent and experienced class action attorneys to represent Plaintiff and the interests of the Class. By prevailing on her own claims, Plaintiff will establish Defendants' liability to all members of the Class. Plaintiff and Plaintiff's counsel have the necessary financial resources to litigate this class action adequately and vigorously. Plaintiff and counsel are aware of their fiduciary responsibilities to the Class and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

75. Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. Individual actions by members of the Class seeking individual remedies will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

76. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## **CAUSES OF ACTION**

77. Plaintiff does not plead, and hereby disclaims, causes of action under the FDCA

and regulations promulgated thereunder by the FDA. Plaintiff relies on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

### PLAINTIFF'S FIRST CAUSE OF ACTION
**(Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*.)**
**On Behalf of Plaintiff and the Subclass**

78.     Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

79.     Plaintiff and Class members are consumers under the Illinois Consumer Fraud Act and Defendants are a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

80.     Defendants engaged, and continue to engage, in the wrongful conduct alleged herein in the course of trade and commerce, as defined in 815 ILCS 505/2 and 815 ILCS 510/2.

81.     815 ILCS 505/2 (Illinois Consumer Fraud Act) prohibits:

[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

82.     815 ILCS 510/2 provides that a:

person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . (7) represents that goods or services are of a particular standard, quality, or grade . . . if they are not; . . . [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

83. Defendants' representations and omissions concerning the representations were false and/or misleading, as alleged herein.

84. Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

85. Defendants made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing contained high quality proteins that provided nutritionally more grams of protein per serving than the Products actually provided, and that the Products were appropriate for meeting protein dietary needs. Defendants had a duty to disclose the corrected amount of protein per serving in the NFP, as calculated according to the PDCAAS method, which Defendant failed to do.

86. Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing Defendant's Products or paying less for them.

87. Defendants' false or misleading representations and omissions were such that reasonable consumers would attach importance to them in their purchasing decisions.

88. Defendants' false and misleading representations and omissions were made to the entire Class as they were prominently displayed on the packaging of each of the Products.

89. Defendants knew, or should have known, that their representations and omissions were material and likely to mislead consumers, including Plaintiff and the Class.

90. Defendants' practices, acts, and course of conduct in marketing and selling the Products misled, and continue to mislead, reasonable consumers to their detriment.

91.     Defendants profited from the sale of the Products as a result of their false, deceptive, and/or unlawful representations and omissions as alleged herein.

92.     Defendants' wrongful business practices were, and are, a continuing course of conduct in violations of the Illinois Consumer Fraud Act.

93.     Defendants' wrongful business practices were a direct and proximate cause of actional harm to Plaintiff and the Class.

94.     As a direct and proximate result of Defendants' unfair and deceptive trade practices, Plaintiff and the Class have suffered ascertainable loss and actual damages. Plaintiff and the Class would not have purchased, or at minimum, would have paid less for the Products had the truth about the Products' protein content been disclosed. Plaintiff and the Class did not receive the benefit of the bargain. Plaintiff and the Class are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill Comp. Stat. 505/1, *et seq*.

### PLAINTIFF'S SECOND CAUSE OF ACTION
**(Violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 505/2, *et seq*.)**
**On Behalf of Plaintiff and the Subclass**

95.     Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

96.     Defendants are a "person" as defined by 815 ILCS §§ 510/1(5).

97.     Defendants engaged in deceptive trade practices in the conduct of their business, in violations of 815 ILCS §§ 510/2(a) by, without limitation, the following: (i) unlawfully making a protein claim on the front of the package without complying with the regulatory requirements for making a protein claim set forth in 21 C.F.R. § 101.9(c)(7)(i)-(iii) and incorporated by reference by California's Sherman law; and (ii) misleading reasonable consumers regarding the quality of protein in their products and its contribution to consumers' daily protein needs by omitting the PDCAAS-corrected %DV for protein. Defendants knew consumers would purchase the Products and/or pay more for them under the erroneous belief that

the Products contained the amount of protein advertised on the front label of the Products in a form usable to humans. The prominent advertising of the protein content on the Products shows Defendants' understanding the information about protein content is material to consumers. As a result of their deceptive acts and practices, Defendants have sold large quantities of the Products to consumers in Illinois. Absent Defendants' false, misleading, and/or deceptive conduct, Plaintiffs and the Class would not have purchased the Products or, at a minimum, would have paid less for them.

98.     Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

99.     Defendants' actions, as alleged herein, constitute unfair and deceptive acts and practices which were immoral, unethical, oppressive, and unscrupulous. The acts and practices alleged herein cause substantial injury to Plaintiff and the Class that they could not reasonably avoid. The injuries to Plaintiff and the Class outweighed any benefits to consumers or to competition.

100.     Defendants continue to market and sell the Products with the false and misleading statements detailed herein.

101.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and the Class have suffered, and will continue to suffer, injury, ascertainable losses of money and/or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

102.     Plaintiff and the Class are entitled to such injunctive relief to ensure that Defendants cease their unlawful acts and practices.

103.     Plaintiffs and the Class seek all relief allowed by law, including injunctive relief, damages, and reasonable attorneys' fees.

## PLAINTIFF'S THIRD CAUSE OF ACTION
### (Common Law Fraud, Deceit and/or Misrepresentation)
### On Behalf of Plaintiff and the Class

104.     Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

105.     Defendants have fraudulently and deceptively informed Plaintiff that the Products provide more grams of protein than they actually provide in a form useful to the human body due to their failure to provide a statement of the corrected amount of protein per serving in the NFP, calculated according to the PDCAAS method, on all the Products, as they were required to do.

106.     These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendants, not reasonably known to Plaintiff, and material at the time they were made. Defendants knew, or should have known, the composition of the Products, and knew, or should have known, that the Products did not contain or provide the amount of protein represented on the label. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff, and those similarly situated, as to whether to purchase the Products. In misleading Plaintiff, and those similarly situated, and not so informing them, Defendants breached their duties to Plaintiff and the Class. Defendants also gained financially from, and as a result of, their breach.

107.     Plaintiff, and those similarly situated, relied to their detriment on Defendants' misrepresentations and fraudulent omissions. Had Plaintiff, and those similarly situated, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing fewer of the Products, or (iii) paying less for the Products.

108.     By and through such fraud, deceit, misrepresentations, and/or omissions, Defendants intended to induce Plaintiff, and those similarly situated, to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiff, and

those similarly situated, to, without limitation, purchase the Products.

109. Plaintiff, and those similarly situated, justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

110. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff, and those similarly situated, have suffered damages, including, without limitation, the amount they paid for the Products.

111. Defendants' conduct as described herein was wilful and malicious and was designed to maximize Defendants' profits even though Defendants knew that they would cause loss and harm to Plaintiff and those similarly situated.

**PLAINTIFF'S FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**On Behalf of Plaintiff and the Class**

112. Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

113. Plaintiff and members of the Class conferred a benefit on the Defendants by purchasing the Products.

114. Defendant have been unjustly enriched in retaining the revenues from Plaintiff's and Class members' purchases of the Products, which retention is unjust and inequitable, because Defendant falsely represented that the Products contained specific amounts of protein per serving, while failing to disclose that the Products actually provided less protein than represented.

115. Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution and nonrestitutionary disgorgement of profits to Plaintiff and the Class members for their unjust enrichment, as ordered by the Court. Plaintiff, and those similarly situated, have no adequate

remedy at law to obtain this restitution.

116.    Plaintiff, therefore, seeks an order requiring Defendants to make restitution and nonrestitutionary disgorgement of profits to him and other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and those similarly situated, respectfully requests that the Court enter judgement against Defendants as follows:

A.    Certification of the proposed Class and Subclass, including appointment of Plaintiff's counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D.    An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E.    An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

F.    An award of treble damages, except for those causes of action where treble damages are not legally available;

G.    An award of restitution in an amount to be determined at trial;

H.    An award of nonrestitutionary disgorgement of profits in an amount to be determined at trial;

I.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

J.    For reasonable attorneys' fees and the costs of suit incurred; and

Class Action Complaint

K.      For such further relief as this Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: December 1, 2023                    MEGAN TAYLOR

By:  /s/ Peter S. Lubin
One of her attorneys

Peter S. Lubin
Patrick Austermuehle
LUBIN AUSTERMUEHLE, PC
17W220 22nd Street, Suite 410
Oakbrook Terrace, IL  60181
(630) 333-0333
peter@l-a.law
patrick@l-a.law


**GUTRIDE SAFIER LLP**
Seth A. Safier, Esq. (PHV app. to follow)
Marie McCrary, Esq. (PHV app. to follow)
Hayley Reynolds, Esq. (PHV app. to follow)
100 Pine Street, Suite 1250.
San Francisco, CA 94111

Class Action Complaint